## STANDARD COAL CO. v. INDUSTRIAL COMMISSION OF UTAH, et al.

No. 4429.   Decided December 8, 1926.   (252 P. 292.)

84

*Wilson & Barnes,* of Salt Lake City, for plaintiff.

*Harvey H. Cluff,* Atty. Gen., and *J. Robert Robinson,* Asst. Atty. Gen., and *Ben E. Roberts,* of Salt Lake City, for defendants.

GIDEON, C. J.

Proceedings to review an award of the Industrial Commission.

On January 12, 1925, John L. Wilson was employed by the plaintiff here, Standard Coal Company. He received an injury on that day in the course of his employment. He was taken immediately to a hospital in Salt Lake City and was discharged from the hospital on February 2, 1925. Mr. Wilson will be referred to in this opinion as the applicant.

The applicant was paid compensation by the coal company at the rate of $16 per week until October 1, 1925, amounting in all to $592. Hospital expenses in the sum of $160 were also paid. On the 22nd day of October, 1925, the applicant filed with the Industrial Commission a claim for adjustment of compensation. In this application he set forth that he was injured on January 12, 1925; that he sustained a fracture of the skull and injuries to his chest; and that he was totally and permanently disabled. He also stated in his petition that he had received compensation up to and including October 1, 1925. Prior to the hearing on that petition, to wit, on October 28, applicant filed an additional petition with the commission, in which applicant alleged that he desired to receive compensation from the special fund established by the Workmen's Compensation Act (Comp. Laws 1917, §§ 3061-3165, as amended). In this second petition applicant recited at some length the former injuries that he had received. A hearing was had by the commission and it, among other things, made the following findings and conclusions:

"That on the 12th day of January, 1925, John L. Wilson was injured by reason of an accident arising out of or in the course of his

employment while regularly employed by the Standard Coal Company at Standardville, Utah. That at the time of the injury the applicant was earning $48 per week, working six days per week. That as a result of said injury the Standard Coal Company assumed liability and paid compensation from within three days of the date of the accident, at the rate of $16 per week, up to October 1, 1925. * * * That the applicant had sustained previous serious injuries as follows, to wit: May 1, 1900, at Scofield, Utah, while employed by the Utah Fuel Company; in 1900 he was accidentally shot through the hip, which resulted in one leg being shorter than the other; in January, 1911, at Winter Quarters mine, while employed by the Utah Fuel Company; in 1916 at Hiawatha, Utah, while employed by the United States Fuel Company, and in 1920 at Salt Lake City, Utah, while employed by the Utah Oil Refining Company. That during all the years subsequent to applicant's injury of May 1, 1900, he was engaged almost continuously in rather hard manual labor. That he was one of the first men out of the hospital after the Scofield disaster, and that he went into the mine to search for and help bring out the body of his father-in-law, which had not been recovered prior to his discharge from the hospital. That he never suffered with dizzy spells prior to his injury of January 12, 1925, and that previous to this accident he had at all times been able to perform his labor in a workmanlike manner—satisfactory to himself and his various employers. * * *

"The known factors which would tend to lessen his physical powers are, first, his age, and, second, a battle of 25 years against disease. Certainly if he has suffered permanent partial disability from advancing years or the ravages of disease or through exposure to inclement weather or through intemperate habits, such permanent partial disability cannot reasonably be charged up to industry and paid for out of the combined injury benefit fund.

"Dr. E. F. Root testified that the only difference practically in Wilson's present condition and his physical condition prior to January 12, 1925, was that his complaint of dizziness was greater. Wilson testified positively that he had never been dizzy prior to the accident of January 12, 1925, while employed by the Standard Coal Company; that he had never been unable to perform his usual duties in a satisfactory manner and this testimony is supported by an almost unbroken record of hard manual labor extending over a period of 25 years.

"In view of the foregoing, the commission concludes that John L. Wilson did, on January 12, 1925, sustain an injury by reason of an accident arising out of or in the course of his employment while regularly employed by the Standard Coal Company at Standardville,

Utah; that as a result of said injury he has suffered a period of total disability from the date of the injury up to the present time and is still suffering total disability; that, therefore, the Standard Coal Company should pay to John L. Wilson compensation as provided by law so long as said total disability continues.

"The commission further concludes that John L. Wilson did not previously incur a permanent partial disability, as a result of his various injuries, prior to January 12, 1925, of such nature that his disability from his injury of January 12, 1925, was greater than it would have been except for the disabilities resulting from his previous injuries; that at all times up to January 12, 1925, he was able to perform his usual duties without discomfort to himself and with satisfaction to both himself and his employers; and that, therefore, his application for compensation from the combined injury benefit fund should be denied."

The commission made an award in conformity with its findings and conclusions. The coal company contends that the findings of the commission that the applicant sustained "total permanent disability solely by reason of the last injury" is contrary to the evidence and that, on the contrary, the evidence shows without substantial dispute that the greater part of the injuries following the accident of January 12, 1925, was attributable to prior injuries. It is its contention that the serious character of the prior injuries sustained by the applicant leads to no other conclusion than that the injuries resulting from the last accident are in a large measure attributable to former accidents.

It is shown by the testimony that the injuries sustained by the applicant prior to January 12th were of a serious nature. It would naturally follow that such injuries would, to a certain extent, render the applicant less able to withstand the result of subsequent injuries that might be received. The evidence, however, supports the findings of the commission that, notwithstanding the former serious injuries, the applicant was able at all times to and did perform manual labor and did his work in a satisfactory manner.

Only two witnesses testified before the commission, the applicant and Dr. Root, the physician who attended him

after the accident of January 12th. The doctor testified that in his judgment about the only difference in the condition of the applicant after the last injury is that the applicant was a little more dizzy than he was before; that prior to the last injury the applicant had sustained injuries to his skull, "cracking, breaking the bones of his skull very much." The doctor further testified that the last injury in all probability opened up the wounds again, but as to that he did not know. The most serious condition of the applicant is his dizziness; that is, his inability to balance himself, hence his inability to do and perform any continuous service. There is not any dispute as to his present condition in so far as his ability to do work is concerned. The applicant himself testified, in answer to questions, as follows:

"Q. Now on January 12, 1925, before you were hurt this last time, were you still suffering from these previous injuries? A. No, sir.

"Q. Had you fully recovered? A. I think so, and I wasn't what you would say fully recovered, but I was always all right. I was able to go ahead and do my work.

"Q. What were you doing at that time? A. I was running a motor.

"Q. Were you dizzy prior to this last injury? A. No, sir.

"Q. Had no dizzy spells? A. No, sir."

Further on the applicant testified:

"Q. Now immediately prior to your injury of January 12, 1925, what was the condition of your hearing? A. Good; nothing the matter with it whatever."

The applicant had been employed by the Standard Coal Company more than one month at the time of his accidental injury. It is not in evidence that he was unable to perform the duties assigned to him in a manner satisfactory to his employer. His testimony is positive that he was not suffering from his prior injuries on January 12, 1925. Further that while he "wasn't what you would say fully recovered" he was able to go forward with his work. Dr. Root testified:

"How much more dizziness he has now as compared before the last injury I don't know because he had a lot of ear involvement. He was totally deaf in that ear and maybe this injury brought a little more on; I don't know."

The doctor also testified that, if the applicant had not had the former injuries, he would not expect him to be in the condition that he is now, and said:

"It is by reason of the combined injuries that he is in the condition he is today."

When requested to describe the last injury the doctor said:

"To go back behind everything, we simply had an X-ray picture made to insure the possibility of any new fracture, not that there was any evidence of a new fracture nor any injuries apparent about that, but the X-ray picture showed a lot of breaks of the bones. It showed a break right down through from top to bottom of the parietal bone on the left side. * * * I am not so dead sure whether that was the last injury or whether it was there before. At any rate he had numerous cracks in the skull and no symptoms."

The doctor also said in answer to questions by applicant's counsel:

"Q. You don't know whether he suffered this dizziness prior to the injury of January 12th? A. No; he certainly did not have enough to prevent his work.
"Q. In his present physical condition with this dizziness, as I understand you to say, it is your opinion he would be unable to go out and work as a laborer at the present time? A. Oh, yes; he couldn't earn full wages as a laborer, I am quite sure."

It is by reason of this testimony of Dr. Root, together with the admitted fact that the applicant had sustained several serious accidental injuries prior to the injury of January 12th, that the coal company contends that it should not be alone answerable for the present condition of the injured employee. It is also the contention of the coal company that, if Mr. Wilson is entitled to further compensation, such compensation should be paid from the special fund

provided by the Workmen's Compensation Act. The particular section of the statute relied upon by the company is subdivision 6, § 3140, Comp. Laws Utah 1917, as amended by chapter 67, Laws Utah 1921. Said subdivision reads as follows:

"If any employee who has previously incurred permanent partial disability incurs a subsequent permanent partial disability such that the compensation payable for the disability resulting from the combined injuries is greater than the compensation injuries is greater than the compensation which except for the pre-existing disability would have been payable for the latter injury, the employee shall receive compensation on the basis of the combined injuries, but the liability of his employer shall be for the latter injury only and the remainder shall be paid out of the special fund provided for in subdivision 1 of this section."

It must be admitted that at the time the applicant entered the employ of the Standard Coal Company he was suffering bodily infirmities, such infirmities as would render him more liable to suffer injuries from an accident than if the prior injuries had not occurred. There is, however, no evidence that these infirmities ever incapacitated him for work or that there had been any decrease in wages by reason of his physical condition. The finding of the commission that the applicant was able to work satisfactorily at all times prior to January 12th has support in the evidence. He was employed by the Standard Coal Company and it must be presumed that he was capable of earning the wages that he was paid. His right to compensation and the amount thereof are governed under the Workmen's Compensation Law by the fact of employment, by the wages received, and the further fact of an accidental injury in the course of or arising out of the employment. The employer is charged with the duty of paying compensation to the injured employee based upon these considerations. That the employee had infirmities or diseases that might and did render him more susceptible to injury resulting from an accident does not relieve the employer from the duty to pay such compensation. *Pinyon*

*Queen M. Co.* v. *Ind. Comm.*, 59 Utah, 402, 204 P. 323; *Tintic Milling Co.* v. *Ind. Comm.*, 60 Utah, 14, 206 P. 279, 23 A. L. R. 325.

Disability, as that term is used in the workmen's compensation laws, is defined in 2 Schneider, Workmen's Compensation Law, p. 1006, § 400, as follows:

"Disability or incapacity for work in the sense in which it is used in the compensation acts means inability to earn wages or full wages, as the case may be, at the work in which the injured workman was employed at the time of the accident, or inability to perform such work as may be obtainable, or inability to reach his place of work on account of his injuries, or inability to secure work to do."

Cases are cited by the author in support of the text quoted from the states of Massachusetts, Iowa, and Kansas and from England.

It is no defense to a claim for compensation that the injury lighted up, reopened, or revived an existing infirmity of the injured employee. Such is the holding of this court in the cases cited above. The principle or rule of law there announced is supported by the great weight of authority, if not by the unanimous opinions of the courts. Our statutes prescribe no standard of health or of physical condition to entitle one to the benefits of the Compensation Act.

In the course of the opinion in *Crowley* v. *City of Lowell,* 223 Mass. 289, 111 N. E. at page 787, the court said:

"The statute prescribes no standard of fitness to which the employee must conform, and compensation is not based on any implied warranty of perfect health, or immunity from latent and unknown tendencies to disease, which may develop into positive ailments, if incited to activity through any cause originating in the performance of the work for which he is hired. What the Legislature might have said is one thing, what it has said is quite another thing, and in the application of the statute the cause or partial or total incapacity may spring from, and be attributable to the injury just as much where undeveloped and dangerous physical conditions are set in motion pro-

ducing such result, as where it follows directly from dislocations; or dismemberments; or from internal organic changes capable of being exactly located."

In *Pace* v. *North Dakota Comp. Bureau*, 51 N. D. 823, 201 N. W. at page 351, the court says:

"It is quite immaterial that the decedent may have brought with him a disability. The evidence supports a finding that the disability brought with him was aggravated by the conditions under which he was compelled to labor, and that ultimately there came a time when his weakened heart and arteries could no longer stand the strain, when he suffered a collapse and died from apoplexy a few days later."

Further on in the same opinion it is said:

"Notwithstanding the fact that existing disease or infirmity, from whatever cause, may have predisposed him to an injury of the character that caused his death—the bursting of a blood vessel—his widow may be entitled to compensation if the rupture of the blood vessel, with resulting apoplexy, took place earlier because of the excessive heat."

The fifth headnote in *Dickson Const. & R. Co.* v. *Beasley,* 146 Md. 568, 126 A. 907, is as follows:

"Extended disability beyond duration of any natural result of comparatively slight injury, prolonged by disease or infection with which claimant was infected, cannot be said to result from the infection rather than the injury, where previous to injury, disease, or infection was inactive and was made disabling only by intervention of injury."

In the course of the opinion, page 910 (146 Md. 576) of the same volume, this language is found:

"Up to this point we understand the parties to be in agreement on the law. But the appellants argue, further, that, even with so much granted, the undisputed evidence in this case is that the extended disability of this man was beyond the duration of any natural results of the injury itself, and was prolonged only by the infection, and therefore it was the natural result of the infection, rather than of the injury. This, it seems to us, could never be a valid argument in a case in which there is evidence sufficient for a finding of fact that

the disease or infection was previously inactive, and was made disabling only by the intervention of the injury. For, once it has been determined that this was the fact, then any prolongation of the disability by the infection so started up is still regarded as a prolongation of the effects of the injury."

See, also, Hull's Case, 125 Me. 135, 131 A. 391, and *Patrick* v. *J. B. Ham Co.*, 119 Me. 510, 111 A. 912, 13 A. L. R. 427.

We are of the opinion, and so hold, that the findings of the commission that the total permanent disability resulted from the injury of January 12, 1925, is supported by the evidence.

The award of the commission is affirmed.

THURMAN, FRICK, and CHERRY, JJ., concur.

STRAUP, J. I dissent.

While Wilson was in the employ of the Standard Coal Company he was injured January 14, 1925, and taken to a hospital and discharged therefrom February 2, 1925. Compensation was paid him by the company at the rate of $16 per week till October 1, 1925, amounting to $592, and his hospital expenses amounting to $160. On October 22nd he filed an application with the Industrial Commission for an adjustment of his claim for compensation, in which he averred that he was injured January 12, 1925, and sustained a fracture of the skull and injuries to his chest, and that he was totally and permanently disabled, and that he was paid compensation only to and including October 1, 1925. Before a hearing was had on such petition, he, on October 28, filed another and further petition before the commission, in which he averred that he desired to make application for compensation from the special fund established under our Workmen's Compensation Act which (Laws Utah 1921, § 3140, subd. 6) provides that—

"If any employee who has previously incurred permanent partial disability incurs a subsequent permanent partial disability such that

the compensation payable for the disability resulting from the combined injuries is greater than the compensation which except for the pre-existing disability would have been payable for the latter injury, the employee shall receive compensation on the basis of the combined injuries, but the liability of the employer shall be for the latter injury only and the remainder shall be paid out of the special fund" otherwise provided for in the act.

In that petition he averred that he, in May, 1900, while in the employ of the Utah Fuel Company, was injured in what is known as the Scofield coal mine disaster in which, through an explosion, he was thrown 820 feet from the mine and sustained a fracture of the skull, and that " a hole was torn" in his side, and was rendered unconscious for a long time and his life dispaired of, and when he regained consciousness he had no recollection of the accident; that he was in a hospital for about three months and that such injuries so received were of such nature as to render him unable to do hard work; that in 1909, while he was in business for himself at Clear Creek, he was accidentally shot through the hip, shattering the bone and causing the leg to be considerably shorter than the other; that in 1911, when again in the employ of the Utah Fuel Company, and when riding a car in the mine, a wheel of the car came off, in which accident his ribs were broken and his leg injured; that in 1916, while employed by the United States Fuel Company, he had two fingers mashed, requiring them and a part of the hand to be amputated; that in 1920, while in the employ of the Utah Oil Refining Company, he suffered further injuries by being struck by a falling timber, knocking him down and breaking his ribs; and then, on January 12, 1925, while in the employ of the Standard Coal Company "as motorman, the motor ran away, resulting in a fracture of the left parietal portion of the skull and contusion of the chest," and was taken to a hospital and on October 1, 1925, the attending physician advised him to return to work, but that due to his physical condition he was unable to get any work that he could do. Such petition, he alleged, was sumitted to his former employers for their approval as to accuracy

of the statements therein contained respecting his injuries and was signed by Wilson and by his former employers, who certified that the statements in the petition concerning the injuries were correct.

A hearing was had upon these petitions. Notwithstanding the commission found that appellant had sustained prior injuries and as in his second petition alleged, it, nevertheless, found that after such injuries, and before he entered upon his employment with the Standard Coal Company, the applicant almost continuously was engaged in rather hard manual labor and was able to perform his labor in a workmanlike manner; that prior to his last injury he had not suffered from dizzy spells, but suffered from such spells thereafter; and that the applicant was totally and permanently disabled, which disability was solely attributable to the last injury, and thus ordered that the Standard Coal Company be required to pay the applicant compensation at the rate of $16 per week so long as such disability continued, and denied the petition for payment of any compensation out of the special fund.

The Standard Coal Company has presented the record for review, and, with respect thereto, contends that the finding of the commission that the applicant sustained "total permanent disability" solely by reason of the last injury is contrary to and against the evidence; that on the record it is shown without substantial dispute that the greater part of the claimed disability is attributable to his prior injuries, and that there is no substantial conflict in the evidence that such prior injuries were of a serious character, and that applicant's disability is attributable, at least in part, to such prior injuries; that on the record the amount which the Standard Coal Company has already paid, $16 a week for about nine months, or $592, and $160 hospital expenses before the proceedings were instituted, compensated the applicant for all disability sustained by him attributable to the last injury, and that on the record in no event should the Standard Coal Company be required to compensate the ap-

plicant for a total disability; and if, because of his condition, the applicant is entitled to further compensation due to such prior injuries, that such additional compensation in whole or in part be paid out of the special fund.

The applicant entered the employ of the Standard Coal Company only about a month prior to the last injury. In his written application for employment he was required to answer, among other interrogatories, (1) whether he had ever been injured, and (2), if so, where, (3) to state the nature of the injury. To the first interrogatory, he answered, "Yes"; to the second, "at Scofield, Utah"; and to the third, "Legs broken and arms broken," but stated nothing about his skull being fractured in an injury, or that he at any time had sustained any injury whatever to the head. In the filed report of the injury the employment of the applicant is described merely as a "motorman" in the mine; the manner in which the injury occurred only as "motor ran away"; and the injury as "a suspected fracture of the skull and injured and bruised on chest" and that the employee was taken to the hospital. No details or other description of such matters were given. In his first application filed with the commission the applicant with respect to his injuries merely averred that he "was injured by reason of an accident in the course of his employment, and that the accident occurred at the mine" of the company, and that he "sustained a fractured skull, and that his chest and left side were also injured." No further or other details as to such matters were there stated. In the second application he, with respect to the last injury, merely averred that "on January 12, 1925, while employed by the Standard Coal Company as a motorman, the motor ran away, resulting in fracture of left parietal portion of skull and contusion of chest," and that he was brought to a hospital, where he was satisfactorily attended by Dr. Root, who advised him to return to work on October 1, 1925.

At the hearing the applicant was, but the company was not, represented by counsel. It was stipulated that the cer-

tificates of the officers of the various companies respecting the previous injuries might be considered by the commission as evidence without calling such persons as witnesses. There were only two witnesses called to give testimony, the applicant and Dr. Root. The applicant testified respecting his prior injuries as alleged by him and as to a fracture of the skull and other injuries received by him at the Scofield coal mine disaster and that he as a result of such injuries was confined in a hospital for about three months. He gave no testimony as to the nature, character, or extent of his last injury, or as to the manner in which it occurred. His testimony as to that merely was:

That "they brought me out of the mine, but I didn't know nothing"; that he was unconscious and when he regained consciousness he was at the hospital; that when at the hospital and after he left it he had, and at the time of the hearing still had, dizzy spells and had no such spells prior to the last injury. A member of the commission asked him, "Do you feel as though you would be able to follow any employment?" to which he answered, "Well, I believe if I had something light I think I could"; and in response to the further question, "Do you feel you are able to go out and get a job as a full-fledged workman?" he answered: "No; not since I got this last injury. My head wouldn't let me. But, as I say, I would be willing to try." In response to other questions the applicant answered that when he went to work for the Standard Coal Company he did not suffer from his previous injuries, and on being asked whether he had "fully recovered" he answerd: "I think so; well, I wasn't what you say fully recovered, but I was always all right. I was able to go ahead and do my work."

Dr. Root attended the applicant on the last injury. He, among other things, testified:

That the applicant, prior to the last injury, "had sustained injuries to his skull, cracking, breaking the bones of his skull very much. This last injury in all probability opened the wound again—I don't know—but at any rate we didn't at first consider there was much injury to the skull at all. In fact, he didn't think his skull was hurt much at first, but as time went on it developed he was perhaps more dizzy than he had been before," and to give relief from the dizziness a decompression operation was decided upon to take the pressure off of the ear space to see if the auditory nerve might

be relieved somewhat thereby, but the operation did not do any good, but had no bad results, and "how much more dizziness he has now as compared before the last injury I don't know because he had a lot of ear involvement. He was totally deaf in that ear and maybe this injury brought a little more on—I don't know."

## The doctor further testified:

That if the applicant had not had the former injuries he would not expect him to be in the condition that he is in now and that "it is by reason of the combined injuries that he is in the condition he is today." When asked to describe the last injury, the doctor answered: "To go back hebind everything, we simply had an X-ray picture made to insure the possibility of any new fracture, not that there were any symptoms of a new fracture nor any injury apparent about that, but the X-ray picture showed a lot of break of the bone. It showed a break right down through from top to bottom of the parietal bone on the left side. * * * I am not so dead sure whether that was the last injury or whether it was there before. At any rate he had numerous cracks in the skull with no apparent symptoms." The doctor, after stating that it was uncertain whether the condition of dizziness was due to the last injury or to the previous injury, was asked: "What is your opinion as to that?" He answered: "Really what I think about that, the man was in mighty bad shape before, and he sustained this last injury, and it 'touched him off.' In fact this last injury was the last straw."

## He further testified:

"Just how much injury was done at the last accident I don't know because he had sustained head fractures before. It is pretty hard to read in an X-ray picture the old from the new. The old injury weakened his head, there is no question about that. A skull will break more easily after it has sustained a fracture than it did prior to that. Whether that had much to do with it I don't know."

In addition to this is the statement of the applicant himself in his second petition that the injuries received by him at Scofield were of such nature as to render him unfit for hard work. The applicant did not, nor did any other witness, testify at the hearing that he sustained a fracture

of the skull in the last injury. Nor are there any conditions or circumstances as to the happening of such injury testified to whereby it may be inferred that the applicant in the last injury sustained a fracture of the skull, or any other serious injury to the head, other than his testimony that he was rendered unconscious and was taken out of the mine in such condition. Though from the fact that he was rendered unconscious it may be inferred that he received some injury to the head, yet the character or the extent of it is not made evident, other than by the testimony of Dr. Root, who, in effect, testified that the present physical condition of the applicant is not due, or at least not wholly due, to the last injury. As to that I do not find any substantial conflict in the evidence. To find that the admitted and undisputed serious prior injuries—a prior severe fracture and breaking of the bones of the skull, the amputation of two fingers and a part of the hand, the shattering of the hip bone, rendering the leg considerably shorter than the other, the breaking of his ribs on several different occasions, and injuring his side—did not constitute a permanent partial disability is to make a finding against common knowledge. And on the record to find, as did the commission, that a total permanent disability was *solely attributable to the last injury,* when the nature, character, or extent of it is in no particular described or characterized, even no evidence that in the last injury any bones of the skull were in fact fractured or broken, or to what extent any injury was sustained about the head, or the nature or character of any such or any other injury, and in disregard of the serious prior injuries, is to fly in the very face of the record. I think the Standard Coal Company should not be required to compensate the applicant for any disability not occasioned by the last injury. It can be required to compensate him only for such disability as was sustained by him as the result of that injury.

The commission seems to have viewed the matter that if the disability was due to and the result of all the injuries, or of a combination of them, the burden of proof was upon the company to show how much of the disability was due

to the last injury and how much to the prior injuries. I think the commission erred in that. In seeking compensation from the Standard Coal Company the burden of proof was upon the applicant to show whatever disability claimed by him was attributable to the last injury, for, it is such disability, and no other, for which he may seek compensation from his last employer; in other words, he cannot have compensation from the last employer for whatever disability was occasioned, or to the extent it was contributed to by his prior injuries. And if he sought compensation partly from the Standard Coal Company and because of his prior injuries partly from the special fund, the burden of proof likewise was on him to show how much of his disability was attributable to the last injury and how much to the prior injuries. It was, at least partially, if not wholly, because of such erroneous view as to burden of proof that led to the finding that a total permanent disability resulted from the last injury. That is deducible from statements made by the commission at the hearing and from a portion of the findings. Or the commission may have taken the view, as appears from other portions of the findings, that though the applicant had sustained serious prior injuries, as was indisputably shown, which to some extent disabled him, yet, since notwithstanding them he was able to do some work, it was the last injury which, added to the other injuries, totally disabled him, and therefore it regarded the Standard Coal Company liable for compensation for the total disability. Such view, as is readily seen, also is erroneous. An employee in a prior employment may in the course of it have met with an accident resulting in the loss of an eye or arm, but which injury was not a total disability and still permitted him to engage in some kind of work and labor and perhaps earn as much as he had earned before he sustained such injury; but subsequently and while working for another employer he may have sustained another injury in the course of his employment whereby he lost the other eye or arm which injury added to the other resulted in a total permanent disability. In such case it is apparent that the second or last

employer is not liable to compensate the employee as and for a total permanent disability, for such disability was not occasioned in such last employment. And to that effect are the authorities. *State ex rel. Garwin* v. *District Court,* 129 Minn. 156, 151 N. W. 910; *Weaver* v. *Maxwell Motor Co.,* 186 Mich. 588, 152 N. W. 993, L. R. A. 1916B, 1276, Ann. Cas. 1917E, 238.

In view of the record I think it is manifest that the findings of the commission that a total permanent disability resulted from the last employment and injury is not sustained by and is against the evidence, and that the order making the award or allowance based upon such finding should be vacated. The coal company, however, asks us to do more and on the record determine that it has already compensated applicant for all the disability resulting from the last injury and to direct the commission that whatever additional compensation, if any, is to be awarded the applicant, is to be paid out of the special fund, or, if it be determined that full compensation has not so been paid for the disability resulting from the last injury, that we on the record determine the amount of such additional compensation that should be paid by the coal company and what amount should be paid out of the special fund. It for some time has been the rule of this court that, in reviewing records of the commission, we, because of the particular language of the act, can only affirm or annul an order of the commission allowing or disallowing compensation, and that we may not otherwise modify an order of the commission nor otherwise direct or control it. Though we were possessed of such power, nevertheless, the record with respect to essentials involved is so fragmentary that wisdom forbids the exercise of it, and under such circumstances all that ought to be done by us is to vacate and annul the order of the commission and demand the case for rehearing and further proceedings. Such I think should be the order.