# GRASTEIT v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 4829.  Decided Aug. 8, 1930.  (290 P. 764.)

*Clarence Baird* and *Benj. Spence,* both of Salt Lake City, for plaintiff.

*Geo. P. Parker,* Atty. Gen., and *Bagley, Judd & Ray,* of Salt Lake City, for defendants.

EPHRAIM HANSON, J.

On November 9, 1929, plaintiff's application for compensation on account of the death of her husband was denied by the Industrial Commission. The commission found (1) that the death of applicant's husband was the result of a "suspected cerebral hemorrhage," (2) that the evidence does not disclose "that he died as the result of an accident," (3) that "the applicant has not sustained the burden of proving that the death of her husband was the result of an accident." As a result of such findings the commission "concluded that the applicant's claim for compensation should be denied," and it was so ordered. The action of the commission in this respect is before us on a writ of review.

It seems that, after the record has been sent up to this court in response to the writ, the attorney of record for the applicant withdrew from the case. The record has been withdrawn from the office of the clerk upon two occasions by other attorneys for the purpose of preparing a brief in in applicant's behalf. We have not been favored with a brief for either party. We have, however, made a careful examination of the record and of the authorities.

The deceased was 45 or 47 years of age. On July 17, 1928, the date of his death, he was assisting his employer in filling the places in the pavement on the streets of Salt Lake City from which the car tracks had been removed.

A certain paving mixture consisting of asphalt, sand, and gravel, heated to a required temperature of from 225 to 300 degrees Fahrenheit was dumped from trucks into these places and each load partially leveled off by means of hand shovels as soon as it was dumped. The special duty of the deceased in reference to this work consisted in leveling off

the material by means of a hand rake. On this particular job two men, the deceased and another, did the leveling with the rakes. The deceased had been assigned to this work as a raker only the day before. Prior thereto he worked as a flusher. So far as the heat is concerned the work of a flusher is the same as that of a raker. The flusher applies the molten asphalt as the surface or final layer after the other materials are leveled and rolled.

To his companion raking by his side, and who had known and worked with him from 12 to 15 years, and to the foreman, who had known him for 17 years, and to the city inspector on this job, who had known him but a few months, all of whom testified in behalf of the applicant, *he appeared* to be well and strong and in perfect health. The foreman had "never known him to make any complaints regarding his health." His widow, although she testified at the hearing before the commission, said nothing whatever concerning the condition of his health.

On the day in question the deceased began work at about 7:30 a. m. The witnesses said it was a hot day, "extremely hot on the street." A statement from the weather bureau at Salt Lake City was admitted in evidence showing that the temperature and humidity of July 17, 1928, was as follows: 9:00 a. m. 78 degrees, 44 per cent humidity; 10:00 a. m. 79 degrees, 44 per cent humidity; 11:00 a. m. 80 degrees, 38 per cent humidity; 12:00 noon 82 degrees, 30 per cent humidity.

He started to work a little faster than was usual or necessary until about 11 o'clock, when his fellow employee, raking by his side, observed a change in the manner in which he did his work. His companion saw the deceased push his rake "a little bit" and then stop a few seconds and put one hand up to his forehead and draw it accross his eyes while he held the rake with the other hand. He would then push his rake and then stop. He did this three times within from five to ten minutes. His companion then said to him; "Herman, you had better go over and sit down for a few

minutes, I can finish this load." On this suggestion, he put his rake in the fire, as was the usual thing to do, and then went to the curb unassisted, but walked with a noticeable stagger. He was seen to sit down on the curb, and within a second or two toppled over on his side in an unconscious condition. While working he had perspired very freely during the morning. He was taken to the emergency hospital in a state of coma; and, about fifteen minutes after his arrival there, he died, which was approximately thirty minutes after the first symptoms of his trouble became manifest.

Dr. Galligan, in describing the symptoms found by him when Mr. Grasteit was brought to the emergency hospital said:

"His respiration was labored. He had a typical Cheyne-Stokes respiration. There was an irregularity between the two pupils, the pupil on the right side being widely dilated, and didn't react to light, and the one on the left side was contracted. * * * His heart was full bounding and slow. * * * Clinically, I believe he died from hemorrhage of the brain."

We quote further from the doctor's testimony:

"Q. (By Commissioner McShane) Have you any doubt in your mind as to the cause of death so far as the clinical history is concerned? A. No, sir. I am positive from the clinical history."

In his judgment there were no symptoms of "heat exhaustion" or "sunstroke" present in Mr. Grasteit's case.

Dr. Galligan also stated that the work and condition in which Mr. Grasteit was working may have been contributing factors to his death, and conversely, they may have not had any contributing effect at all, as people died from cerebral hemmorhage in their sleep or in the winter time. In cases of cerebral hemorrhage anything or nothing may be contributing causes. He also testified that the given temperature of the day with the corresponding humidity would not be considered excessive heat, and that a post

mortem examination might show a pathology that may have contributed in the cerebral hemorrhage.

Dr. Kahn, a medical expert called on behalf of the defendants, and who had heard the testimony given before the commission on behalf of the applicant, testified that he could not positively state what was the absolute cause of death, but in the circumstances of the case cerebral hemorrhage was the most probable cause of death. It is usually a small artery which is ruptured and usually in the respiratory region of the brain, and it is the pressure on that center which causes unconsciousness. The doctor was quite emphatic that the cause of death was neither heat exhaustion nor sunstroke. As to whether he regarded the fact that the deceased was working in the hot asphalt was a contributing cause, we here quote from his testimony in this regard:

"Q. (By Commissioner Knerr) It is my understanding you don't believe this man's death was the result of his employment by reason of working in this hot asphalt, as alleged in the complaint? A. No, sir."

### Cross-examination by Mr. Christensen:

"Q. You don't think it was even a contributing factor? A. You know the word 'contributing' is a flexible word. Suppose you were sitting in that chair; you go to rise; you can cause a cerebral hemorrhage. You may be in bed and turn over and cause a cerebral hemorrhage. That would be a contributing cause; anything you were doing, any kind of work may contribute to cerebral hemorrhage."

The three medical experts called on behalf of the applicant testified that in their opinion the work the deceased was doing and the heat in which he was working were contributing causes of his death. Two of them, Dr. Christensen and Dr. Petersen, could not say whether the immediate cause of death was heat exhaustion or cerebral hemorrhage. Dr. Grosbeck, the other medical expert, gave it as his opinion that death might be caused by either sunstroke or heat exhaustion, and, whatever the immediate

cause of death was, his working in the hot sun and in the heated materials were contributing factors towards the death of the deceased. But the opinion of the doctor was based upon facts assumed by counsel for the applicant that Mr. Grasteit was "perfectly healthy in every respect and that he had been examined for an insurance policy within the last year and had been found normal as to blood pressure and arteries."

Counsel, recognizing that the evidence did not show that the deceased had been given a medical examination with the results as stated in the question, made the statement that such evidence would be produced later on. That these facts were regarded as important by the doctor and influenced his opinion appears from the following excerpts from the transcript:

"A. Well, before I answer the question may I ask what knowledge you had of this man's physical condition?

"Q. The evidence is he was perfectly healthy before he went to work; assume that state of facts at least? A. Had he any evidences of medical attention during the year to prove that he was?

"Q. Assuming in addition to those facts, doctor, that he had been examined in the previous year for an insurance policy. The evidence does not show this, but it will * * * and had been found normal as to blood pressure and arteries? A. You don't know how long prior to his death?

"Q. A little over a year, anyway around a year; * * * assume for the purpose of the hypothetical question * * * that the evidence will show that he was perfectly healthy and normal when he went to work that morning. * * * Doctor, you answer the question on that hypothesis, as to whether the extreme heat of the day and the heat of the materials on which he was working contributed to the collapse? A. If the man was perfectly well in the morning when he went to work, and collapsed at the time of the work, no matter what he was doing, whether he was just using a pick or shovel or anything else it all contributed to his collapse. * * * You are not giving me any evidence for what the collapse might be? *I am answering purely from the hypothetical question.*"

The record does not show that Mr. Grasteit had been given a physical examination to ascertain if he were eligible for

life insurance, or that in such examination he had been found to be in a normal condition as to his blood pressure and the condition of his arteries. It is evident from the foregoing questions asked by Dr. Groesbeck that his opinion that the immediate physiological cause of the death of deceased was due to heat exhaustion, and that his employment contributed to his collapse, was based upon such assumption.

From the testimony of other experts in the case as well as from common experience we learn that it is not an uncommon occurrence for people who are in apparently good health and who seem strong and robust to be suddenly stricken with a cerebral hemorrhage when no unusual exertion precedes the event, occurring when the victim is in absolute repose, sitting in his chair, or sleeping in his bed, and in either warm or cold weather. Although the finding of the commission to the effect that the death of deceased was the result of a "suspected cerebral hemorrhage" is somewhat indecisive and uncertain, we think the case must be viewed as one where the physiological cause of death was cerebral hemorrhage.

The occurrence of a cerebral hemorrhage in the absence of some traumatic injury denotes a pre-existing high blood pressure or a diseased and weakened condition of the arteries or both. The condition is a progressive and developing ailment. If the prostation and death of the deceased was due solely to the diseased condition of his arteries and blood pressure, it cannot properly be said that the deceased was "killed by accident," the standard established in our compensation act as the ground for compensation to dependents. It is said in Corpus Juris Treatise on Workmen's Compensation Acts, p. 65, § 55, that "an idiopathic as distinguished from a traumatic disease cannot be regarded as an injury by accident."

The Court of Appeals of California in the case of *California Notion & Toy Co.* v. *Industrial Acc. Comm.*, 59 Cal. App. 225, 210 P. 524, 525, annulled an award to an employee 63 years of age who, following a fall from a short step

ladder which he used for taking goods from the shelves in the course of his work, from which he received only slight bruises, became afflicted by an impediment of speech and unable to think coherently. The employee had been in the service of the employer for 25 years and had not had occasion to require the services of a physician except occasionally for a cold. The cause of the affection as explained in the medical expert's report was "his arterial condition—and there has long been present arterial disease—is the fundamental basis of his picture." Another report said in substance that the patient suffered a vascular cortical lesion rather on the basis of high blood pressure and arteriosclerosis than as a result of the fall.

The question as there presented to the court was very similar to what we have before us, and in the course of the opinion the court said:

"An analysis of the cases relied upon by the respective parties hereto and of the cases cited therein would seem to establish:

"(1) Where the proximate and immediate cause of the injury is disability arising solely from an idopathic or subjective condition, the weight of authority, including the decisions of this state, are against recovery, though the injury clearly occurs in the course of employment. *Eastman Co.* v. *Industrial Accident Commission*, supra [186 Cal. 587, 200 P. 17.]

"(2) The burden of proving that the injury arose out of the employment is upon the applicant. *Casualty Co.* v. *Industrial Accident Commission*, 176 Cal. at page 533, 169 P. 76. A failure to sustain a burden of proof cannot be remedied by a finding based upon guess, conjecture, or surmise. Glass on Workmen's Compensation Law, pp. 39, 40; *Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363, 64 P. 480."

It is not to be understood, however, from what is here said that we hold that the accident cannot be attributed to the employment. There is nothing said in our Compensation Act (Comp. Laws 1917, § 3061 et seq., as amended) about protection being confined to the healthy employee. It is well recognized by the authorities that "it is the hazard of the employment acting upon the particular employee in his condition of health and not what that hazard would be

if acting upon a healthy employee or upon the average employee." *Madden's Case*, 222 Mass. 487, 494, 111 N. E. 379, 382, L. R. A. 1916D, 1000; *Hartz* v. *Hartford Faience Co.*, 90 Conn. 539, 97 A. 1020.

Whatever predisposing pathology in the nature of diseased arteries or excessive blood pressure may have existed, if the collapse was brought on by any strain or condition of deceased's employment, it would be compensable. Acceleration or aggravation of a pre-existing disease is an injury in the occupation causing such acceleration. *McEwan* v. *Industrial Comm.*, 61 Utah 585, 217 P. 690; *Standard Coal Co.* v. *Industrial Comm.*, 69 Utah 83, 252 P. 292; *Eastman Co.* v. *Industrial Acc. Comm.*, 186 Cal. 587, 200 P. 17.

In our opinion the previous condition of the employee's health is a most material circumstance to be considered and weighed by the commission in ascertaining, so far as that may be reasonably done, whether the injury resulted solely from the disease or from the disease and the employment. It is purely a question of fact to be determined by the Industrial Commission. The test to be applied is: Did the accident come from the disease alone, or did the employment contribute to it in any material degree.

The burden of proof before the Industrial Commission was upon the applicant to establish this proposition by a preponderance of the evidence. This is the test applied in the following cases: *F. H. Gilcrest Lumber Co.* v. *Rengler*, 109 Neb. 246, 190 N. W. 578, 28 A. L. R. 200; *Hartz* v. *Hartford Faience Co.*, supra; *Madden's Case*, supra.

In *Clover, Clayton & Co.* v. *Hughes*, L. R. 1910, App. Cas. 242, where a workman suffered from an aneurism, in tightening a nut with a spanner, fell dead from a rupture of the aneurism caused by a strain arising out of the ordinary work of the deceased, Lord Loreburn said:

"In each case the arbitrator ought to consider whether in substance, as far as he can judge on such a matter, the accident came from the

disease alone, so that whatever the man had been doing it would probably have come all the same, or whether the employment contributed to it. In other words, did he die from the disease alone, or from the disease and employment taken together, looking at it broadly? Looking at it broadly, I say, and free from overnice conjectures, was it the disease that did it, or did the work he was doing help in any material degree?"

In view of the evidence of Dr. Galligan and Dr. Kahn, a brief resume of which we have given, we think there is some competent evidence to support the findings and conclusion of the commission, and the findings are therefore conclusive upon this court. *Adams* v. *Industrial Comm.*, 67 Utah 157, 246 P. 364; *Kavalinakis* v. *Industrial Comm.*, 67 Utah 174, 246 P. 698.

The order of the commission denying compensation is therefore affirmed.

CHERRY, C. J., and ELIAS HANSEN and FOLLAND, JJ., concur.

STRAUP, J. (dissenting).

In reviewing the evidence as bearing on the cause of the death of the deceased, I think the intensity of the heat and the conditions in such respect under which the deceased worked at the time of his collapse have not been sufficiently noticed.

All of the witnesses testified that the day on which the deceased collapsed and the previous day were very hot, and that the asphaltum handled by him was heated to a temperature of from 250 to 300 degrees Fahrenheit. One of the witnesses working with the deceased at the time of the collapse testified:

"It was a bright, sunny day, hot; it was one of the hottest days we had last summer; I noticed it was extremely hot; it was right hot on the street there. Q. Just go ahead in your own words and tell to the Commissioner what happened in this particular case that you noticed? A. Well, I noticed Grasteit; he had started to working and

started working a little bit fast that day and he got on my side where he was working kind of close to me and I told him not to try to do too much and keep on his own side of the street—you know it was awful hot—and to take it a little easy. He raked that morning until about ten or eleven o'clock—about eleven o'clock I would say, when I noticed—we had a load about half raked out; we were both in the street working close together. He started to push a little bit with his rake to level it off and would only make a few moves with his rake and then he would stop and put his hand up to his forehead and hold to the rake with other hand. He would stand that way a few seconds and then work again. I noticed he done that two or three times then I looked at him and said, 'Herman, you go over and sit down for a few minutes, I can finish this load.' The load was about half finished and I said I could finish it. He took his rake and put it in the fire where we keep them warm and staggered over and sat down on the curb, and in a few moments he keeled over on his side and then on his back and became unconscious."

Another witness testified that the deceased at the time of the collapse was and prior thereto had been "working vigorously." The work was performed by him on a street pavement under the direct rays of the sun. When the weather report of the weather bureau, referred to in the prevailing opinion as showing the temperature on the day in question at about the time of the collapse to be 82 degrees, was put in evidence by the insurance carrier, its counsel stated he did not know where or the conditions under which the temperature was taken. We may well assume it was taken in the shade either on the ground or on top of a building or other structure and as such temperatures usually are taken, and that it was not taken under conditions similar to those under which the deceased worked at the time of his collapse. Every one knows that heat on a street pavement under the direct rays of the sun is far more intense than in the shade or on top of a building or other structure; and, adding to the intensity of the heat, was the further fact that the deceased was working immediately over and handling the heated asphalt material.

The expert witnesses, the physicians, some of them called on behalf of the applicant and some on behalf of the insur-

ance carrier, disagreed as to the immediate cause of the death. Two, called by the applicant, expressed opinions that the cause was "heat exhaustion," or "heat stroke," two called by the insurance carrier that it was cerebral hemorrhage; and one called by the applicant that he could not say whether it was the one or the other cause. However, all of them testified that without an autopsy, which was not had, it could not definitely be determined whether the death was from the one cause or the other. If the direct or immediate cause of death was cerebral hemorrhage, and if it be held that loss by death from such a cause is not compensable, but is if the death was caused by heat stroke or heat exhaustion, or if it be held that a death from either cause is not an accident within the meaning of our workmen's compensation act, then the denial of an award made by the commission should be affirmed.

In the application for compensation it, among other things, was alleged that, "while so engaged in said employment, said deceased suffered an industrial injury and accident from which he immediately died." It was not alleged whether the death resulted from brain hemorrhage or heat stroke or what was the immediate cause of death. At the hearing the applicant gave evidence to show the prior good health of the deceased, the excessive heat and the kind of work at which the deceased was engaged at the time of his collapse and called two physicians who testified that in their opinion the immediate cause of death was heat stroke or heat exhaustion, and one who testified he could not say whether it was heat stroke or brain hemorrhage. The insurance carrier called two physicians who expressed opinions that the cause of death was brain hemorrhage.

The commission did not find that the cause of death was cerebral hemorrhage, but found it was the result of a "suspected cerebral hemorrhage." The findings of the commission are:

1. "That Herman Grasteit, on July 17, 1928, was employed by Gibbons & Reed Company as an asphalt raker; that on said date the said

Herman Grasteit died, his death being the result of a suspected cerebral hemorrhage."

2. "The evidence does not disclose that Herman Grasteit died as the result of an accident while employed by Gibbons & Reed Company."

3. "The commission further finds that applicant has not sustained her burden of proving that the death of her husband was the result of an accident at the time and in the manner alleged."

From that it would appear the commission was doubtful as to the immediate cause of death, but rather ruled the case on the determinative factor that death was not the result of an accident, that it did not arise through or out of accidental means, and hence the loss was not compensable. If the commission took the view that cerebral hemorrhage in the course of employment might not, like sunstroke, or heat stroke, or heat exhaustion, be regarded as an accident, or as arising out of accidental means and for that reason a loss occasioned by death from cerebral hemorrhage was not compensable, then the commission misconceived and mistook the law. The pertinent question here is not so much whether the immediate or direct cause of death was cerebral hemorrhage, or heat or sun stroke; but more particularly whether the cerebral hemorrhage or heat stroke whichever was the immediate cause of death, was induced or contributed to by the excessive heat and the kind of work being performed by the deceased under the conditions and circumstances surrounding him at the time of his collapse. In other words, if the collapse was induced or contributed to by the excessive heat and the work being performed by the deceased in the course of his employment, then, it seems to me, it is immaterial whether the immediate cause of death was cerebral hemorrhage, or sun stroke, or heat stroke, for in such case, either, under our Workmen's Compensation Act, would be regarded as an accident or as accidental means arising out of or in the course of the employment and the loss of death compensable. Though it be assumed that it was within the province of the commission to accept the testimony and the expert opinions of the phy-

sicians that the immediate cause of death was cerebral hemorrhage, instead of the testimony and opinions expressed by the physicians that the death resulted from heat stroke or heat exhaustion, and to make a finding, which the commission did not do, that the cause of death was cerebral hemorrhage, or though it be assumed that the commission had found that the death resulted from cerebral hemorrhage, yet, on the record, how stands the case?

Witnesses, wholly disinterested and who had worked with the deceased and who had intimately been associated with him for many years and up to the time of his death, testified, in substance, that the deceased was a strong, healthy, able-bodied man, a good strong workman, free from ailments of any kind, and that about a year prior to his death passed a successful examination for life insurance. Such testimony was not disputed. There was no evidence to show that the decased suffered from or was afflicted with a weak heart, or from diseased arteries, or high blood pressure, or had any ailment to which cerebral hemorrhage could or might be attributable, or that he suffered from any ailment.

There is testimony to show from some of the physicians that excessive heat and exerted energy thereunder are contributing and inducing causes of cerebral hemorrhage, and that cerebral hemorrhage under such circumstances may well be caused, where without them it would not be. Such physicians expressed opinions that the excessive heat and the energy exerted by the deceased were contributing causes to his collapse whether the immediate cause of death was cerebral hemorrhage or heat stroke. Other physicians, testifying that the cause of death was cerebral hemorrhage testified that one may have cerebral hemorrhage or apoplexy in cold weather and without exertion, even while sitting in a chair or in bed by merely turning over. However, all of the physicians testified that excessive heat and exertion are contributing causes to cerebral hemorrhage, depending upon the extent of the heat and the amount of energy exerted. Of course, as explained by the physicians, brain

hemorrhage may be due to many causes, to high blood pressure, inelasticity or a diseased condition of the arteries, a weak heart, or to a clogging or diseased condition of brain vessels, or to other causes; but cerebral hemorrhage ordinarily does not result in one of the age of the deceased, in healthy condition and free from ailments and not suffering from a predisposed condition likely to cause cerebral hemorrhage. There was not anything to show that the deceased suffered from any predisposed condition likely to cause cerebral hemorrhage. The evidence without dispute shows he was healthy, strong, and able-bodied. His collapse did not result under normal or ordinary conditions, or while he was not exerting himself, or merely walking down the street, or sitting in a chair, or turning over in bed, or drinking buttermilk. When it is shown he was in good health and not anything to show he suffered from any ailment or predisposed condition to which cerebral hemorrhage may be attributable, then why conjecture and speculate that he might have had cerebral hemorrhage sitting in a chair or turning over in bed. Further, it is well recognized that, as to many subjects or questions, expressed opinions of experts as a general rule are regarded with inherent infirmity because consisting largely of mere opinions and are considered as but aids or advisory and in many jurisdictions as of a low order of evidence and of an unsatisfactory character. Such considerations go not only to the mere weight of testimony but more to the legal probative effect to be given it, matters concerning which it has been held are proper admonishments and caution by courts to juries. Besides it is common observation that many experts are prone to evolve theories and cloud matters in bewildering technical nomenclature, concerning which they are called to express opinions, and are free to give one in support of the claim or contention of the litigant calling them. Here medical experts freely suggested instances under which cerebral hemorrhage has and may occur, the subject while sitting in a chair or turning over in bed, without exertions of any kind, and without any show-

ing that the collapse of the deceased occurred under such conditions or circumstances and without any showing of, or taking into consideration, any predisposed condition of the subject likely to result in cerebral hemorrhage, which led the commission to find that the deceased died from "a suspected cerebral hemorrhage" which was neither accidental nor arising out of nor in the course of employment, and in all probability would have resulted had the deceased on the day of his collapse remained at home sitting in a chair.

Thus when we look to the cause of the hemorrhage, if such was the immediate cause of the collapse, and more especially to contributing causes but for which the hemorrhage would not have occurred, the record not only naturally and reasonably points to the excessive heat and to the conditions under which the work was performed by the deceased at the time and does not point to any other reasonable or probable cause, except upon mere conjecture and speculation that the hemorrhage might have been caused wholly uninfluenced by the intense heat and exertions of the deceased. It having been shown that the deceased was in good health, there is not anything in the record to support any such conjecture or speculation or any cause of the collapse, except the excessive heat and conditions under which the work was performed. To me it is clear that the commission either regarded a death caused by cerebral hemorrhage in the course of employment not an accident, or disregarded the evidence that the excessive heat and the kind of work being performed by the deceased naturally and reasonably pointed to contributory causes of the collapse and based its ruling on mere conjecture and without any evidence to support it, that "the suspected hemorrhage" resulted or might have resulted from a cause wholly uninfluenced by the excessive heat and the kind of work performed by the deceased at the time of his collapse. A finding on the one is against law, and on the other is against the evidence.

Though the deceased, unbeknown to him, or to his associates, had been afflicted with weakness of the heart, or

diseased arteries, or with some other ailment, rendering him susceptible to brain hemorrhage, yet, if the excessive heat and the work performed by him under the attending conditions and circumstances as disclosed by the record were contributing causes of the hemorrhage and but for which the hemorrhage would not have resulted, death, in such case, under our Workmen's Compensation Act would be regarded as an accident and the loss compensable. We in principle have held that several times. *McEwan* v. *Industrial Comm.*, 61 Utah 585, 217 P. 690; *Standard Coal Co.* v. *Industrial Comm.*, 69 Utah 83, 252 P. 292. To that effect is also the recent case of *Monk* v. *Charcoal Iron Co.*, 246 Mich. 193, 224 N. W. 354.

I therefore am of the opinion that the order made by the commission denying compensation should be vacated and the cause remanded for further proceedings.